# Exhibit A

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 2 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                ROBERT LISTENBEE, JR.

```
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          ----
 3
    RACHEL SPIVACK,            :   CASE NO. 2:22-cv-
 4   Plaintiff,                :   01438-PD
                               :
 5        v.                   :
                               :
 6   CITY OF PHILADELPHIA and  :
     LAWRENCE S. KRASNER,      :
 7   Defendants                :
 8
                          ----
 9             Friday, August 5, 2022
                         -----
10
    Zoom pretrial deposition of ROBERT LISTENBEE, JR.,
11
    held in the offices of Schnader, Harrison, Segal &
12
    Lewis LLP, 1600 Market Street, Suite 3600,
13
    Philadelphia, Pennsylvania 19103, commencing at
14
    10:02 a.m., on the above date, before Mickey Dinter,
15
    Registered Professional Reporter, Certified Court
16
    Reporter and Notary Public for the Commonwealth of
17
    Pennsylvania.
18
                         -----
19
20                       -----
              RELIABLE COURT REPORTING
21               1650 Arch Street
                   Suite 2210
22            Philadelphia, PA 19103
                  215.563.3363
23                       -----

24                                    COPY

25
```

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 3 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER						ROBERT LISTENBEE, JR.

Page 2

```
 1   A P P E A R A N C E S:

 2
     CHRISTINA MARTINEZ, ESQUIRE
 3   245 Bricktown Way, Suite J
     Staten Island, NY 10309
 4   (347) 215-4543
     christinamartinezesq@gmail.com
 5   Counsel for Plaintiff

 6
     CLARK HILL PLC
 7   BY:  JESSICA REILLY, ESQUIRE
     2001 Market Street
 8   Suite 2620
     Philadelphia, PA 19103
 9   jreilly@clarkhill.com
     Counsel for the City of Philadelphia
10

11   SCHNADER, HARRISON, SEGAL & LEWIS.
     BY:  DAVID SMITH, ESQUIRE
12   1600 Market Street, Ste. 3600
     Philadelphia, PA  19103
13   215-751-2000
     Dsmith@schnader.com
14   Counsel for Lawrence S. Krasner

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 4 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER         ROBERT LISTENBEE, JR.

Page 30

1  That was sometime in, I'm pretty sure, in
2  January, I believe; January, February, March.
3  I don't remember the exact date.
4      Q. January of 2022?
5      A. Bear with me for a moment.  Let me
6  think about it for just a moment.
7      Q. Okay.
8      A. I believe that the vaccination policy
9  was either May or began implementation in
10 early March.
11     Q. We'll get to the policy.  Do you
12 know if it was, if the decision to implement
13 a mandatory vaccine policy was made after
14 the City's mandatory vaccine policy was
15 implemented?
16     A. I was not paying close attention to
17 the date and time of the implementation of
18 the City's policies.
19     Q. So, it was a separate, independent
20 decision from the City's...
21     A. We did not have a meeting and say
22 that we were going to implement this policy
23 because the City was implementing its
24 policy, to the best of my knowledge.
25     Q. Who created the specific policies

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 5 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                ROBERT LISTENBEE, JR.

Page 31

 1   and procedures for the vaccine management
 2   in the DA's office?
 3        A. Those policies were developed, I
 4   believe, primarily by Cecilia Madden and
 5   in consultation with the DA.  However, there
 6   was a senior staff meeting where they were
 7   discussed and we were asked by the DA if we
 8   approved other recommendation in the
 9   policies. I personally recall that I approved
10   others and encouraged them.
11        Q. Was there, like, a vote?
12        A. We didn't have votes, per se.  We
13   were asked our opinions and several of us
14   gave our opinions and I gave mine.
15        Q. Do you remember anybody else's
16   opinions?
17        A. Well, the DA at one point asked if
18   there was anybody who objected to the
19   policies.  I do not recall anybody
20   objecting.
21        Q. Was it just Cecilia Madden and DA
22   Krasner who was tasked with coming up with
23   the specific requirements of the vaccine
24   mandate?
25        A. No.

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 6 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                    ROBERT LISTENBEE, JR.

Page 35

```
 1                    MR. SMITH:  Objection to form.
 2         You may answer.
 3         A. The DA is an independently elected
 4   official in the City and, as such, he has
 5   certain discretionary policies over the
 6   District Attorney's Office that are different
 7   than the policies that the mayor may impose
 8   on all the other offices and organizations
 9   that are under the City mandate.
10         Q. Who decided to provide religious
11   and medical exemptions to the DA'S Covid 19
12   mandate?
13                    MR. SMITH:  Objection to form.
14         You may answer.
15         A. The final decision on medical
16   exemptions and religious exemptions was
17   recommended by the DA and the senior staff
18   all agreed that this was a policy that we
19   thought was important to impose.
20         Q. So, can you explain to me how exactly
21   that decision was made?
22         A. We had a fairly lengthy discussion,
23   massive discussions, by various members of
24   the team.  There was deep concern about how
25   we, as an office, were dealing with the
```

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 7 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER         ROBERT LISTENBEE, JR.

Page 36

1  senior citizens which, in our office, were
2  over the age of sixty.  There was deep
3  concern about how we, as an office, were
4  dealing with family members who had children
5  for whom there was no vaccination available
6  at that time.  There was deep concern about
7  how we, as an office, could continue to
8  function as an effective prosecutorial
9  agency within the City of Philadelphia and
10 meet the demands and requirements of the
11 courts.  The courts were opening up more
12 and more courtrooms.  So, there were lots of
13 issues that were paramount to us and each
14 of us had a particular area that was of
15 great concern to us.  I was deeply concerned
16 about children and deeply concerned about
17 senior citizens personally.  I was asked --
18 those are the things that I stressed. In the
19 final analysis, the senior staff meeting
20 participants all agreed that we shall
21 impose those policies.
22                The DA, he was an expert on
23 one area.  He discussed the legal research
24 that he had done with us at that meeting.
25 After that discussion, we all agreed with

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 8 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER          ROBERT LISTENBEE, JR.

Page 37

1    him.
2        Q. What makes DA Krasner an expert on
3    religious exemptions?
4              MR. SMITH:  Objection to
5        form.
6        A. The DA had done research on -- he's
7    a lawyer and a legal scholar.  He does
8    research on lots of different issues.
9              When we have a senior staff
10   meeting, if the DA asked questions about
11   issues related to juveniles, I'm the expert.
12   I am an expert on juvenile practice.  I was
13   chief of the Juvenile Unit of the Public
14   Defender's Office for twenty-seven years.
15   I was in the administrative office for four
16   years and I've been supervising prosecutorial
17   issues regarding juveniles for the last
18   four-and-a-half years, so I consider myself
19   an expert.  The DA has areas of expertise
20   the same way each one of us do.  Judge Temin
21   has expertise on judicial policy and
22   practice.  Each one of us utilized our
23   expertise for situations we had.  People
24   would often defer to me or defer to the DA
25   depending upon the issue or defer to

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 9 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER            ROBERT LISTENBEE, JR.

Page 38

1    **Judge Temin.  We were asked to gather**
2    **information and present them to the team.**
3         Q.  Okay.  You just mentioned some
4    qualifications that you have that would
5    qualify you as an expert on juvenile issues.
6    What qualifications does DA Krasner have
7    that would qualify him as an expert on
8    religious exemptions?
9                    MR. SMITH:  Objection.
10                   **THE WITNESS:  He had done**
11       **considerable research on the issue.  He**
12       **was our expert on the issue.  As I**
13       **indicated, each of us had our own**
14       **background and experience.  Each one of**
15       **us was a lawyer who had done extensive**
16       **research on cases related to specific**
17       **topics.**
18                   **The DA presented what he**
19       **thought was a sound position.  We**
20       **discussed it and we agreed.**
21   BY MS. MARTINEZ:
22        Q.  Did the DA's office, this team that
23   was implementing the religious exemption,
24   did you consult with anyone who was an
25   expert in religious accommodations?

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 10 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                ROBERT LISTENBEE, JR.

Page 54

 1   employees may need to wear masks when
 2   entering City buildings and the courthouses?
 3        A. This policy is referring to the
 4   requirement that the First Judicial District
 5   had that said that lawyers and other staff
 6   from the District Attorney's Office, other
 7   staff, meaning even police officers entering
 8   the building, had to follow the updated
 9   mask-wearing policy or they cannot get in
10   the building.  That's what it was focused
11   on.
12        Q. Into what building?
13        A. The Criminal Justice Center.
14        Q. What about the DAO office?
15        A. We had a different set of policies.
16        Q. Did the City mask-wearing policy
17   apply in the DA's office?
18               MR. SMITH: Objection to form.
19               THE WITNESS:  As I have said,
20        the DAO had a separate set of policies.
21        In some cases, we adopted City policies;
22        others, we did not.  We had the
23        discretion to do that because the DA was
24        an independently elected official.
25               Regarding wearing masks, we

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 11 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                ROBERT LISTENBEE, JR.

Page 62

 1   for granting religious exemptions at the
 2   DAO?
 3        A. Yes.  That was reviewed by the DA
 4   and discussed in great detail, but those
 5   discussions were not initially discussions
 6   that I was a part of.
 7        Q. Do you know if there was an appeal
 8   process included?
 9        A. Yes.
10        Q. Yes, there was an appeal process?
11        A. Yes.
12        Q. How did employees that were denied
13   able to appeal the denial?
14        A. I'm not really familiar with the
15   appeals process.  That was handled by the
16   DA and by Cecilia Madden at the time.
17        Q. Okay.  I want to move on.  What type
18   of DAO employees are union members?
19        A. At the present time, there are about
20   twenty law enforcement personnel who are
21   members of the Philadelphia Police Department
22   and the Fraternal Order of Police, the FOP.
23   There are also civil servants who work in
24   administrative capacities in a variety of
25   different units.  I don't know the exact

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 12 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                ROBERT LISTENBEE, JR.

Page 63

1  number.  It's probably less than fifteen;
2  probably closer to about eight or nine, but
3  I don't know the exact number who worked
4  in an administrative capacity throughout
5  our office.  I don't know the name of the
6  unit they are part of.  It's part of the
7  large administrative municipal units in the
8  City of Philadelphia.
9     Q. Are any attorneys member of a union,
10 to your knowledge?
11    A. No.
12    Q. Does the DAO have any --
13    A. To the best of my knowledge, the
14 answer is no.  I say that because we do
15 have attorneys who are not practicing as
16 assistant district attorney's and who are
17 working in administrative capacities in
18 other parts of the office. I cannot identify
19 who they are.  I do know there was at least
20 one.  Whether that person is a member of a
21 union or not, I would not know.  That's
22 technically detailed.  There could be some-
23 body.  There are not assistant district
24 attorneys in a union.
25    Q. Does the DAO have the discretion to

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 13 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER          ROBERT LISTENBEE, JR.

Page 87

1      Q. Ever?

2      A. Subsequently, he discussed the

3  option of whether or not she was willing to

4  work from home and work in the Law Division.

5  He did mention that to me because I was so

6  involved with her while she was working as

7  an employee within the Juvenile Diversion

8  Unit.

9      Q. Was that offered to Rachel when she

10  was an employee at the DAO?

11     A. To the best of my knowledge, no.

12     Q. Why not?

13     A. I don't know.  I was not having

14  those discussions at that time and I had not

15  been having discussions with the DA and the

16  attorneys in this matter until I was asked

17  to participate in this deposition.

18     Q. What accommodations were considered

19  by DA Krasner when he decided not to grant

20  any religious exemptions at the DAO?

21              MR. SMITH: Objection to form.

22              THE WITNESS:  I don't know.

23  BY MS. MARTINEZ:

24     Q. Did he discuss any alternative

25  accommodations with you?

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 14 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER        ROBERT LISTENBEE, JR.

Page 112

1      A. Pleased to meet you, Miss Reilly.

2      Q. In the beginning of your testimony

3   this morning, you talked a little bit about

4   the City's vaccine mandate and its

5   application.

6      A. Yes.

7      Q. So, the union employees that work in

8   the DA's office would be subject to the

9   City's policy because of the collective

10  bargaining agreement between the City and

11  those union employees, do you understand

12  that?

13     A. I do.

14     Q. And that's, I think it was,

15  Exhibit Number 5, what Miss Martinez was just

16  showing you was an example of one of those

17  agreements.  Based on the City's vaccine

18  policies subject to a CDA, do you

19  understand that?

20     A. Yes.

21     Q. That would include certain workers

22  like you were describing, like the police

23  officers or other civil servants under the

24  City's vaccine mandate?

25     A. Yes.

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 15 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER                ROBERT LISTENBEE, JR.

Page 116

 1   there was confusion where the City had ran
 2   an exemption and where we were not planning
 3   on an exemption.  It was not religious; it
 4   was medical.
 5        Q. Based on your personal knowledge,
 6   you don't know whether or not the DAO
 7   eventually denied or granted that request?
 8        A. That's correct, I do not know.
 9        Q. Okay.  I want to transition to your
10   testimony about certain meetings you had
11   with other senior staff members and the DA
12   where you discussed the DAO policy.  No one
13   from the City was present during those
14   meetings, right?
15        A. That's correct, no one from the City
16   was present except -- let's keep in mind the
17   term "from the City" is a term of art. We're
18   all City employees.  So, yes, we were there.
19   There was no representative from City
20   government present or from the City
21   Solicitor's office present or any expert in
22   any area from the Health Department present.
23   That's what I mean.
24        Q. Just to go a little bit further. Are
25   you familiar with the Employee Relation Unit

Case 2:22-cv-01438-PD   Document 32-3   Filed 09/13/22   Page 16 of 16

RACHEL SPIVACK vs
CITY OF PHILADELPHIA and LAWRENCE S. KRASNER          ROBERT LISTENBEE, JR.

Page 117

1  within the City?
2      A. Yes.
3      Q. No one from the ERU was present
4  during those meetings?
5      A. That's correct.
6      Q. Thank you for clarifying that.
7      A. Sure.
8      Q. At the March 4th meeting between you
9  and the plaintiff and certain other senior
10 staff personnel, that meeting only included
11 DAO personnel, correct?
12     A. Correct.
13     Q. I will ask the same question. No one
14 from the City, understanding the City to
15 mean how you just described it, was present
16 or involved in that meeting?
17     A. That is correct.
18     Q. And no one from the City, as you
19 described it, was involved in or included
20 in the Executive Team?
21     A. That's correct.
22          MS. REILLY:  Thank you very
23     much for your time, Mr. Listenbee.  I
24     don't have any further questions.
25          THE WITNESS:  Thank you.