## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                              |   |                   |
|------------------------------|---|-------------------|
| RACHEL SPIVACK,              | : |                   |
| Plaintiff                    | : |                   |
|                              | : |                   |
| v.                           | : | Civ. No. 22-1438  |
|                              | : |                   |
| CITY OF PHILADELPHIA,        | : |                   |
| LAWRENCE S. KRASNER,         | : |                   |
| Defendants.                  | : |                   |
|                              | : |                   |

Diamond, J.                                                  January 4, 2023

### MEMORANDUM

I must determine whether the City of Philadelphia and its District Attorney impermissibly infringed on the religious liberty of an employee who was fired after she refused COVID-19 vaccination for religious reasons. I conclude that they did not and so will grant summary judgment in their favor.

## I.    FACTUAL BACKGROUND

I have set out the facts that are undisputed, resolved all factual disputes in Plaintiff's favor, and construed the resulting record in the light most favorable to her. See Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005). At the same time, I have kept in mind the urgent concerns and confusion that arose as COVID caused widespread sickness and death. Cf. South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613 (Mem) (2020) ("Our Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect. When those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.") (Roberts, C.J., concurring) (internal quotations and citations omitted); Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 78 (2020) ("The nature of the epidemic, the spikes, the uncertainties, and

1

the need for quick action, taken together, mean that the State has countervailing arguments based upon health, safety, and administrative considerations that must be balanced against the applicants' First Amendment challenges.") (Breyer, J., dissenting).

<u>The Parties</u>

In the Fall of 2021, Defendant Philadelphia District Attorney Lawrence Krasner appointed Plaintiff Rachel Spivack to serve as an Assistant District Attorney.  (Doc. No. 33-1, Pl. Statement of Material Facts (SMF) ¶¶ 1, 2.)  Defendant City of Philadelphia is a Pennsylvania municipal government established by the Philadelphia Home Rule Charter.  (Doc. No. 35-2 at 3.)  All District Attorney's Office staff are City employees.  (<u>Id.</u>; SMF ¶ 2.)  The District Attorney, who is an independently elected City official, has discretionary authority to promulgate DAO employment policies that differ from the City's.  (Doc. No. 35-2 at 3; <u>see also</u> Doc. No. 33-6 (Krasner Dep.) at 233:3-18, 234:10-22.)  Mr. Krasner's authority over his staff is unusual in that the DAO has both: "(1) represented employees (i.e., union employees), whose terms and conditions of employment are controlled by a collective bargaining agreement or arbitration proceedings; and (2) exempt and non-represented employees (like Plaintiff [Rachel Spivack]) who are not part of bargaining units and can be subject to the [DAO's] mandated terms and conditions of employment."  (Doc. No. 35-2 at 4; SMF ¶ 12; <u>see also</u> Krasner Dep. at 233:3-18, 234:10-22.)

<u>DAO Initial Response to Pandemic</u>

Krasner makes all significant DAO managerial decisions, including hiring and firing.  (<u>See</u>, <u>e.g.</u>, Krasner Dep. at 6:6-10; 10:11-25; 221:15-25.)  The record thus shows that Krasner amended the DAO Policy several times to conform to growing knowledge of both the virus and the Office's legal obligations.  (<u>Id.</u> at 9:17-25; 10:1-7; 13:13-24; 20:17-34; 107:2-25; 108:1-13.)

In August 2021, the City announced its COVID-19 vaccine mandate, which included

medical, disability, and religious exemptions.  (Doc. No. 35-2 at 4.)  Krasner understood that he

could adopt the City's policy, but chose instead to promulgate a separate DAO policy.  (Id. at 3;

Krasner Dep. at 10:8-11:5; 112:19-115:24.)  The DAO's COVID-19 Safety Committee thus

drafted an initial version of the Office Policy, referring it to Krasner for his review.  (Krasner Dep.

at 7:20-10:7.)  Krasner approved the Policy—which mirrored the City's—"as a key part of [the

DAO's] overall strategy to maintaining a safe workplace in light of [the COVID-19] pandemic."

(Doc. No. 34-3; SMF ¶ 5; Doc. No. 38-1, Def. Krasner's Resp. to Pl. Statement of Material Facts

(RMF), ¶ 5.)

<u>The Policy Changes</u>

As Krasner explained, the Vaccination Policy applied only to the Office's numerous

exempt and non-represented DAO staff.  (Doc. No. 34-2 at 12 n.5.)  In its initial version, the Policy

required these employees, as a "condition of [their] continued employment," either "to provide

proof of vaccination or apply for an exemption by September 1, 2021."  (Doc. No. 34-3.)  Staff

were provided with a "Request for Exemption from Vaccination Policy Form."  (Id.)  Like the

City's Policy, the DAO's Policy included three categories of exemption requests and

accommodations:

- a "Religious Exemption or Accommodation (that could be afforded to "employees with verifiable, sincerely held religious beliefs . . . that conflict with getting vaccinated);
- an "Exemption for Medical Reasons" (that could be afforded to an employee with any "medical condition that is a contraindication to the COVID-19 vaccine"); and
- a "Disability Accommodation" (that could be afforded to an employee whose disability necessitates "an accommodation regarding this [vaccination mandate]").

(Id.) The Office was to "make[] determinations about requested accommodations and exemptions

on a case-by-case basis considering various factors and based on an individualized assessment in

each situation." (Id.)

In the ensuing months, however, the DAO Policy changed significantly, eventually providing for only an extremely limited medical exemption and no religious exemption—thus giving rise to this lawsuit.  When the COVID-19 Omicron variant surged nationwide, Krasner, fearing the consequences of allowing a significant number of staff exemptions, consulted with counsel to determine the DAO's legal obligations.  (Krasner Dep. at 127:13-128:11.)  He explained that it was his "legal imperative . . . an imperative of [his] oath" to "stop the spread of disease." (Id. at 94:3-13.)  He testified that the DAO's "north star was public safety; it was to protect lives." (Id. at 140:16-17).   Accordingly, in early January 2022, having reviewed the law, Krasner concluded that the Office was not obligated to offer religious exemptions.  (Id. at 127:13-24.)  He thus changed the Policy, eliminating them.  (Id.)

Krasner did not eliminate medical exemptions, as he "was not inclined to kill somebody to have that person vaccinated."  (Id. at 140:17-19.)  He limited them significantly, however: he would "make exceptions only when [] truly necessary . . . to save as many peoples' lives as possible."  (Id. at 94:3-13.)  He thus granted a single medical exemption—indeed, the only staff exemption of any kind—to an employee, who:

> simply by being vaccinated faced a very significant risk of death.  It was a very specific medical history she had. . . [S]he had medical certification from a treating doctor whose credentials were legit, saying that she was in far more danger or, at least, she was in more danger of death and debilitating or serious injury if she was vaccinated than the danger she faced from contracting COVID.

(Id. at 136:8-24.)  Of the ten employees who sought medical exemptions, she was "the only one that had a letter saying that the vaccination had a greater danger of death and serious injury."  (Id. at 138:6-9.)

Krasner allowed the possibility of disability "accommodations" for non-union employees. Because he received no disability accommodation requests, however, he "didn't have to look at

[the legal requirements] as closely." (Krasner Dep. at 127:24-128:6.) The DAO Vaccination Policy as finally determined by Krasner was thus quite simple: all non-union DAO employees were required to be vaccinated. Medical exemptions were limited to those for whom vaccination could pose a significant health risk. There was no provision for religious or disability exemptions or accommodations.

<u>Plaintiff Seeks an Exemption, But Refuses an Accommodation</u>

When Ms. Spivack, an Orthodox Jew, started work in September 2021 as a non-union DAO employee in the Office's Trial Division. (SMF ¶¶ 1, 8.) She submitted a letter from her rabbi as notice that she would be seeking a religious exemption from the Office Vaccine Mandate. (Doc. No. 33-8.) Rabbi Yitzchok Chayempour wrote that his entire "congregation categorically opposes [the COVID-19] vaccine as a matter of religious tenet." (Id.) He explained that congregation members are forbidden from: (1) benefitting from the live dissection of animals; (2) using hybridization technologies; (3) "self-flagellating"; (4) exposing themselves to unnecessary risk (Spivack's "natural immunity" to the virus made vaccination unnecessary); and (5) injecting a product whose precise ingredients are undisclosed. (Id.) Neither Krasner nor the City disputes that Spivack's sincerely holds her religious beliefs. (RMF ¶ 3.)

In December 2021 (*before* Krasner eliminated the religious exemption), Spivack—along with seven other non-union DAO employees—submitted an "Application to Support Request for Religious Exemption from COVID-19 Vaccination." (SMF ¶¶ 8, 9.)

On March 4, 2022 (some two months *after* Mr. Krasner had eliminated religious exemptions), Spivack and the other applicants learned that their requests had been denied. (Compl. ¶ 18; RMF ¶ 13.) Three days later, Spivack received a form denial stating that her "[e]xemption request should be DENIED for failing to meet legal requirements"; that a "religious exemption is

not warranted under the law based on the information presented"; and that she "d[id] not present a credible claim that [her] opposition to the vaccine was based on [her] religious beliefs." (SMF ¶ 13; Doc. No. 33-15.) The accompanying form letter further provided: "Based on the continued impact of the COVID-19 pandemic, the DAO, City of Philadelphia, and many other partner agencies in the criminal justice system determined that vaccinations are an essential tool in reducing community spread of COVID-19." (Doc. No. 33-15.) The letter advised that Spivack would be placed on "Unvaccinated Leave" beginning on March 21 if she was unable to "complete a COVID-19 vaccination schedule or obtain at least one dose of a two-part COVID-19 vaccination, by noon on March 18, 2022." (Id.)

Spivack never requested an accommodation—such as working remotely—that would have allowed her to refuse vaccination and keep her job. (Krasner Dep. 151:12-13.) On April 8, 2022, she was fired because she refused the COVID-19 vaccination. (SMF ¶ 26.) A short time later, the DAO offered her an accommodation even though she had not requested one: a position in the Law Division, which would allow her to work remotely on appellate litigation. (Krasner Dep. 151:3-7.) She refused the position. (Id. at 151:9-18.)

## II.    LEGAL STANDARDS

Upon motion of any party, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). I may thus grant summary judgment if the movant shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that

issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it could affect the result of the suit under governing law. Id.

In deciding whether to grant summary judgment, I "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh, 418 F.3d at 267. If, after viewing all reasonable inferences in favor of the non-moving party, I determine that there is no genuine issue of material fact, summary judgment is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The opposing party must support each essential element with concrete record evidence. Celotex Corp., 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (internal citations omitted). This requirement promotes the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (restating Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976)).

On cross motions for summary judgment, the same standards and burdens apply. See Applemans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). Denying a cross-motion does not necessarily mean that the competing cross-motion is meritorious. Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

### III.    PROCEDURAL BACKGROUND

Seeking injunctive, compensatory, and declaratory relief, Spivack proceeds under the First Amendment and related state law. 28 U.S.C. §§ 1331, 1343, and 1367(a). Spivack alleges that:

the DAO vaccination requirement is a "systemic effort" by the City and Krasner "to flagrantly violate federal and state law." (Compl. ¶ 1); see U.S. Const., amend I; 71 Pa. Stat. Ann. §§ 2401-07. She alleges that "Krasner . . . denied [all religious exemptions] solely on the basis of his hostility to religion." (Compl. ¶ 22.) Krasner's "hostility to religion" is demonstrated by "the numerous medical and administrative exemptions" he purportedly has approved. (Id. at ¶ 27.) Spivack thus bases her suit on this "disparate treatment of medical and administrative requests versus religious requests for exemption and accommodation." (Id. ¶ 36.) Shortly after initiating this suit, Spivack filed a Motion for Temporary Restraining Order and Preliminary Injunction, which I denied. (Doc. Nos. 7, 20).

Krasner and Spivack have cross-moved for summary judgment. (Doc. Nos. 33, 34.) Each opposes the other's Motion. (Doc. Nos. 36, 38.) The City has also moved for summary judgment, urging that it "should not be a party to this lawsuit because it played no role in [Spivack's] alleged harm," that Spivack cannot demonstrate municipal liability for decisions made in Krasner's sole discretion, and that City is not a "necessary party" to the action. (Doc. No. 35-2 at 6.) Spivack has responded only to the City's municipal liability contention. (See Doc. No. 39.)

The matters have been fully briefed.

## IV.   DISCUSSION

The record provides scant support for Spivack's heated contentions. There is no evidence of a "systemic effort" by the City and Krasner "to flagrantly violate federal and state law." Nor has Spivack shown that Krasner is "hostile" to religion, or that he approved "numerous medical and administrative [vaccine] exemptions." Moreover, it is difficult to discern which iteration of the DAO Vaccination Policy Spivack challenges. She apparently recognizes that Krasner himself promulgated all versions of the Office's Policy, including the final version which allows only an

extremely limited medical exemption and no religious or disability exemption.  (Doc. 33 at 14; SMF ¶ 15-16.)  Yet, she directs her analytic fire largely at the shortcomings of the Office's initial— August 2021—version of the Policy, which provided for religious, disability, and medical exemptions.  That analysis is belied by her own lawsuit, which she bases on the elimination of any religious exemption—*i.e.*, on the Policy's final version.  (See, e.g., Doc. No. 33 at 8, 9, 13, 15.)  It thus appears that Spivack invokes the Policy version that works to her best advantage, any resulting contradiction notwithstanding.

Although the record is sometimes unclear as to the Policy's precise contours at any particular time, it is quite clear that Spivack was fired because she did not comply with the Policy's final version.  Accordingly, it is that final version of the Policy that I will address.  The undisputed evidence shows that this Policy was intended to prevent sickness and death to the maximum extent possible, and that a single medical exemption was allowed because it furthered those same goals. There is no evidence of any "hostility to religion."  In fact, Spivack was offered an accommodation, which she refused.

In these circumstances, the DAO Policy, whether subject to rational basis or strict scrutiny review, is permissible.

### A.  First Amendment Claim

The Constitution's Free Exercise Clause, applied to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const., amend. I; see Fulton v. City of Phila., 141 S. Ct. 1868, 1876 (2021).  The "free exercise of religion" includes not only "the right to believe and profess whatever religious doctrine one desires," but also the right to act and abstain from acts for religious reasons. Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 877 (1990).

Not all laws that burden this right offend the Constitution, however.  Id. at 878.  Nor do such laws inevitably trigger heightened review.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).  Only a law that is not neutral respecting religion or not generally applicable must pass strict scrutiny, and so "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."  Id.  A neutral law of general applicability is subject only to rational basis review, even if it incidentally burdens a religious practice.  Id.  "Neutrality and general applicability are interrelated": satisfying the former requirement likely means that the latter has also been satisfied.  Id.

Neutrality

The government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."  Fulton, 141 S. Ct. at 1876.  At a minimum, the neutrality principle requires that on its face, a law or policy not single out religious exercise by "refer[ring] to a religious practice without a secular meaning discernable from the language or context."  Lukumi, 508 U.S. at 533-34.  Here, the DAO Policy is facially neutral.  It applies to all non-union staff.  (Doc. No. 34-3.)  It does not "single out employees who decline vaccination on religious grounds."  See We the Patriots USA, Inc. v. Hochul, 17 F.4th 266, 281 (2d Cir. 2021).

A facially neutral law may nonetheless infringe neutrality if it "targets religious conduct for distinctive treatment": "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt."  Lukumi, 508 U.S. at 534.  Accordingly, I must "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders."  Id. at 534 (quoting Walz v. Tax Comm'n of New York City, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)).  Such circumstances include "the historical background of the

decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." Id. at 540.

The circumstances here confirm that Krasner's DAO Vaccination Policy arose from a "deep concern for public health, which is a religion-neutral government interest." See We the Patriots, 17 F.4th at 284. When a COVID vaccine first became available, Krasner promulgated a policy very much like the City's. He allowed staff to request religious exemptions because he did not yet know whether he was legally required to provide them. (Krasner Dep. at 122:19-24 ("This is a document that was done before we had looked carefully at the United States Supreme Court case law[,] before we had full consultation with various attorneys and what that U.S. Supreme Court case signifies.").) With COVID's continuing spread, Krasner eliminated the religious exemption after reviewing the law, consulting with counsel, and weighing exemption-created risks—particularly to the immunocompromised and to children, for whom the vaccine was not yet available. (Id. at 9:2-10:7.) Only then did Krasner review all the exemption requests, which he felt confirmed the wisdom of limiting exemptions. (Id. at 132:12-20.) Cecilia Madden (DAO Deputy Chief of Staff) and Robert Listenbee (First Assistant District Attorney) similarly described these circumstances and Krasner's neutral motivation in first allowing and then eliminating a religious exemption. (See, e.g., Doc. No. 32-3 (Listenbee Dep.) at 35:22-36:24; Doc. No. 33-4 (Madden Dep.) at 62:5-63:9.)

Spivack does not dispute this sequence of events. She nonetheless urges that the Policy "demonstrate[s] a hostility to those who refuse certain medical interventions . . . for religious reasons." (Doc. No. 33 at 7.) Spivack believes that the religious accommodation process was "illusory and insincere" and a "façade," by which Krasner "put forth a process and procedure for

employees to apply for religious exemptions but then systematically and routinely den[ied] every such application." (Id. at 8.)

Spivack largely relies on a small part of Krasner's lengthy deposition, where he described his experience as a civil rights lawyer, when parents "for religious reasons" "refused to provide medical care for their children and whose children then died." (Id. at 7 (citing Krasner Dep. at 231:7-232:8.).) He explained that those parents were subsequently "convicted of crimes." (Id.) Spivack also offers Madden's deposition testimony that the DAO's request for religious exemption applications was "not purposeless" because a number of employees who had intended to request such exemptions "were strongly motivated by the barrier of having to complete that form to go ahead and get vaccinated." (Id. at 8 (citing Madden Dep. at 84:2-15.).)

Spivack has distorted the record. Krasner's deposition responses that Spivack plucks out of context relate to his understanding (based on his professional experience) that "[r]ights are not completely unlimited." (Krasner Dep. at 231:25.) Madden's retrospective reflection on the beneficial effect of the application process only confirms that the DAO sought to encourage vaccination. (See Doc. No. 34-2 at 15.) The challenged deposition testimony—which, in any event, is not a "*contemporaneous* statement[] made by members of the decisionmaking body"— does not create a factual dispute as to whether Krasner's Policy decisions were motived by anti-religion animus. Lukumi, 508 U.S. at 533 (emphasis added); compare M.A. on behalf of H.R. v. Rockland Cty. Dept. of Health, 53 F.4th 29, 37 (2d Cir. 2022) (jury could reasonably find that Emergency Declaration barring unvaccinated children from places of public assembly was designed "to target religious objectors to the vaccine requirement because of their religious beliefs," where policymaker expressed that there is "no such thing as a religion exception" and characterized "anti-vaxxers" as "very ignorant") with We the Patriots USA, 17 F.4th at 283-84

(New York Governor's "personal opinion" that no religious exemption was necessary respecting requirement that healthcare facilities mandate COVID-19 vaccination for certain "personnel," and statement that she was "not aware of" any "sanctioned religious exemption from any organized religion" insufficient to show the plaintiffs' likelihood of success in demonstrating non-neutrality).

Nor could a jury reasonably infer hostility simply because Krasner initially asked employees to apply for a religious exemption that he then eliminated. As I have discussed, the record shows without contradiction that Krasner changed the DAO Policy to reflect his growing knowledge of both the law and the virus itself. He eliminated the religious exemption only after he was convinced that it was not required legally, and that mandating vaccination was essential to the health of his staff and the many people who came into contact with his staff. This was permissible. Cf. We the Patriots USA, 17 F. 4th at 282 ("The absence of a religious exception to a law does not, on its own, establish non-neutrality.") Government officials may revise policies upon gathering additional information, especially when confronting a dangerous and potentially tragic situation. See id. at 281-83 (no evidence of non-neutrality where State "independently promulgated a new Rule" after "extensive process" through which rulemaking body concluded "that the vaccine requirement should apply to a broader set of healthcare entities . . . and should not contain a religious exemption").

In sum, Spivack offers no evidence that Krasner's exemption changes "stemmed from religious intolerance, rather than an intent to more fully ensure that employees at [the DAO] receive the vaccine in furtherance the State's public health goal." Id. at 283.

General Applicability

A law is not "generally applicable" (1) if it prohibits religious conduct but permits comparable secular conduct; or (2) "if it invites the government to consider the particular reasons

for a person's conduct by providing a mechanism for individualized exemptions." Fulton, 141 S.
Ct. at 1877 (internal quotation marks and alterations omitted).

   *Comparable Secular Conduct*—First, I must consider whether an exemption for a single
medical reason and an exemption for religious reasons regulate "comparable" conduct—*i.e.*,
whether a policy can be generally applicable if it allows the former and precludes the latter.
"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged
against the asserted government interest that justifies the regulation at issue." Tandon v. Newsom,
141 S. Ct. 1294, 1296 (2021). "Comparability is concerned with the risks various activities pose."
Id. A law or policy is not generally applicable if it burdens religious conduct, but does not burden
secular conduct that undermines the asserted government interest in a similar way. Fulton, 141 S.
at 1877.

   Krasner asserts that the Policy he finalized serves the following interests: preventing the
spread of Covid within the Office, minimizing staffing disruptions caused by workplace illness,
and protecting medically-vulnerable employees, family members, and participants in the criminal
justice system. (Doc. No. 34-2 at 15.) It is plain that the medical and religious exemptions, when
judged against these interests, do not regulate "comparable" conduct: a stringent medical
exemption promotes health and safety; a religious exemption threatens health and safety. Every
Court of Appeals that has considered the comparability of the risks associated with medical and
religious exemptions from COVID-19 vaccine mandates (albeit at the preliminary injunction
stage) has arrived at this same conclusion. As the First Circuit explained:

> [E]xempting from vaccination only those whose health would be endangered by
> vaccination does not undermine Maine's asserted interests here: (1) ensuring that
> healthcare workers remain healthy and able to provide the needed care to an
> overburdened healthcare system; (2) protecting the health of the those in the state
> most vulnerable to the virus–including those who are vulnerable to it because they
> cannot be vaccinated for medical reasons; and (3) protecting the health and safety

of all Mainers, patients and healthcare workers alike.

<u>Does 1-6 v. Mills</u>, 16 F.4th 20, 30-31 (1st Cir. 2021).   See also <u>We the Patriots USA, Inc. v. Hochul</u>, 17 F.4th 266, 285 (2d Cir. 2021) ("applying the vaccination requirement to individuals with medical contraindications and precautions would not effectively advance" State's interests "to prevent the spread of COVID-19 in healthcare facilities among staff, patients, and residents," "protect[] the health of healthcare employees to ensure they are able to continue working," and "reduce the risk of staffing shortages that can compromise the safety of patients and residents even beyond a COVID-19 infection"); <u>Doe v. San Diego Unified Sch. Dist.</u>, 19 F.4th 1173, 1178 (9th Cir. 2021) ("Limitation of the medical exemption in this way serves the primary interest for imposing the mandate—protecting student 'health and safety'—and so does not undermine the District's interests as a religious exemption would.").

Spivack urges that "[i]t is the law in the Third Circuit that the rejection of a religious exemption while maintaining a medical exemption fails general applicability therefore triggering strict scrutiny." (Doc. No. 36 at 7-8 (citing <u>Fraternal Order of Police Newark Lodge No. 12 v. City of Newark</u>, 170 F.3d 359 (3d Cir. 1999)).) She is mistaken.

In <u>Fraternal Order of Police</u>, the Third Circuit considered the Newark Police Department's policy requiring all its officers to be clean-shaven. <u>Id.</u> at 360, 365. Significantly, the Department's interest purportedly underlying the policy was "fostering a uniform appearance" among its officers. <u>Id.</u> at 366. Because the Court determined that "allow[ing] officers to wear beards for medical reasons undoubtedly undermines the Department's interest" in much the same way as does allowing officers to wear beards for religious reasons, it ruled that the policy was not a neutral rule of general applicability. <u>Id.</u> That is not so here, where the medical exemption *furthers* the DAO's interest in promoting health and safety.

*Individualized Exemptions*— Rules that permit "individualized, discretionary exemptions" may not be generally applicable.  <u>Blackhawk v. Pennsylvania</u>, 381 F.3d 202, 209 (3d Cir. 2004). The Second Circuit has clarified this principle:

> As other Circuits have noted . . . "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons."
>
> *      *      *      *
>
> The "mere existence of an exemption procedure," absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny.

<u>We the Patriots</u>, 17 F.4th at 288 (internal quotations and citations omitted).  The Supreme Court has thus concluded that an unemployment compensation statute basing an applicant's benefits eligibility on "good cause" for the applicant's unemployment was not generally applicable because the statute allowed administrators, in their discretion, to refuse exemptions to applicants who could not work for religious reasons, but to grant exemptions to applicants who could not work for secular reasons.  <u>Smith</u>, 494 U.S. at 872.  Similarly, in <u>Fulton v. City of Philadelphia</u>, the Supreme Court distinguished generally applicable laws from an anti-discrimination provision in municipal contracts with adoption service providers that similarly gave City officials wide discretion to grant broad-based exceptions.  141 S. Ct. 1868, 1878-79 (2021).

Having ignored this authority, Spivack chooses to attack a straw man—the initial Office Policy, not the final Policy pursuant to which she was fired.  (<u>See</u> Doc. No. 36 at 9 (arguing that "Defendant's COVID-19 Vaccine Mandate is not generally applicable because it creates a formal mechanism for granting religious exemptions").)  As I have discussed, however, the Policy's final version—the end result of a gradual process involving Krasner's review of the applicable law and guided by Krasner's concern for public health—provides only a very limited medical exemption.

Based on this exemption, Spivack argues that the Vaccination Policy is not generally applicable because "Krasner considered 'a number of factors' in determining medical exemptions." (Id. at 8 n. 7 (quoting Krasner Dep. at 138:20-139:4).) Courts have recognized, however, that "it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption," and that this "kind of limited inquiry is qualitatively different" from the undefined exemptions in Smith and in Fulton. Axson-Flynn v. Johnson, 356 F.3d 1277, 1298 (10th Cir. 2004); see also 303 Creative LLC v. Elenis, 6 F. 4th 1160, 1187 (10th Cir. 2021) (cautioning against the conflation of an "individualized exemption" with "individualized adjudication"). Once again, the medical exemption Krasner finally approved was for an objectively and narrowly defined category of persons: non-union DAO employees for whom a vaccination could be life-threatening. This is not the kind of exemption that undermines the Policy's general applicability.

Because the DAO Policy as actually implemented is both neutral and generally applicable, it need pass only rational basis review. In an abundance of caution, however, I will also subject the Policy to strict scrutiny.

<u>Rational Basis Review</u>

Spivack address only strict scrutiny. (See generally Doc. Nos. 33, 36.) Presumably, this is because the Office Policy so plainly passes rational basis review, which "requires merely that the [challenged] action be rationally related to a legitimate government objective." Tenafly Eruv Ass'n v. Tenafly, 309 F.3d 144, 165 n. 24 (3d Cir. 2002). The DAO Policy certainly meets this requirement. The Office's interests in "preventing the spread of Covid within the office, minimizing staffing disruptions caused by workplace exposures, and protecting medically-vulnerable employees, family members, and participants in the criminal justice system" are

legitimate.  (Doc. No. 34-2 at 15); see Roman Catholic Diocese, 141 S. Ct. at 67.  The Policy is rationally related to achieving that goal.

### Strict Scrutiny

Strict scrutiny requires that the DAO narrowly tailor its Policy to serve a compelling interest.  Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 67.  It does.

As I have discussed, Krasner promulgated the DAO Policy to "prevent[] the spread of Covid within the office" and to "protect[] medically-vulnerable employees, family members, and participants in the criminal justice system."  (Doc. No. 34-2 at 15.)  "Stemming the spread of COVID–19 is unquestionably a compelling interest."  Roman Cath. Diocese, 141 S. Ct. at 67; see also Mills, 16 F. 4th at 32 ("Few interests are more compelling than protecting public health against a deadly virus.").  Yet, where, as here, the state regulation is challenged under the First Amendment, I may not rely exclusively on "broadly formulated interests."  Fulton, 141 S. Ct. at 1881 (quoting Gonzales v. O Centro Espírita Beneficente União do Vegetal, 546 U.S. 418, 431 (2006)).  Rather, I must also undertake "a more precise analysis" and "scrutinize[] the asserted harm of granting specific exemptions to [the] particular religious claimant[]."  Id.  I thus consider "not whether the [DAO] has a compelling interest in enforcing its [Policy] generally, but whether it has such an interest in denying an exception" to Spivack.  Id

As a prosecutor in the Office's Trial Division—to which she was assigned from the outset—Spivack was required to meet regularly with her coworkers and the general public.  (Krasner Dep. at 149:21- 24.)  Because she started in the Juvenile Diversion Unit, where the high-volume paper discovery required staff's physical presence, she could not work remotely.  (Id. at 150:2-16.)  She was slated to be transferred to the Municipal Court Unit, where she would again have to be physically present in different courtrooms every day and share an office and work space

with other employees.  (Doc. No. 38 at 15.)  Refusing Spivack an exemption from the Vaccine

Mandate thus furthered the DAO's interest in protecting its staff and the public from the spread of

the deadly virus.  Cf. Fulton, at 141 S. Ct. 1881-82 (no compelling interest where refusal to grant

exemption *jeopardized* the government's asserted interests).

Moreover, the Policy was narrowly tailored to serve that interest.  "[N]arrow tailoring

requires the government to show that measures less restrictive of the First Amendment activity

could not address its interest in reducing the spread of COVID."  Tandon v. Newsom, 141 S. Ct.

at 1296-97.  Accordingly, the government must show that it considered less restrictive alternatives

and ruled them out for good reason.  Bruni v. City of Pittsburgh, 824 F.3d 353, 370 (3d Cir. 2016).

Here, the record establishes that the DAO closely considered every alternative to

mandatory vaccination.  Krasner was convinced that vaccinations were the only effective way to

prevent the spread of COVID.  (Krasner Dep. at 206:1-3 ("Q: Are there other ways to mitigate the

risk of [COVID infection] other than vaccination? A [Krasner]: Not good ones in my opinion.").)

He had rejected daily testing because it was both unreliable and cost-prohibitive:

> We considered early-on testing and rejected it and said we're not going to do testing.
> It only provides a snapshot for a particular moment unless you're going to do it
> every hour.  Even then, you have gaps during the hour when you wouldn't know
> what the result is.  It's very easy to fake.
>
>      *       *       *       *
>
> [Testing] does not make any sense to me because it is woefully inadequate as
> compared to vaccination.  Any medical doctor will tell you that.
>
>      *       *       *       *
>
> I have already explained … what a catastrophe it was before there were
> vaccinations…. That's where you could end up if… we're going to act like testing
> is a substitute for vaccination.  It's not remotely a substitute for vaccination.

(Krasner Dep. at 210:3-23; 212:8-11; 217:8-25.  See also id. at 208:17-23 ("Q: How is testing

expensive? A [Krasner]: "You've got to buy a lot of kits and we have six-hundred people,

approximately, in an [sic] facility that is not medical and we have hundreds of people who are not

our employees who are coming in and out all the time.").)

Similarly, he concluded that a masking policy was not a viable alternative to mandatory

vaccination.  Even if masking were at all effective in preventing the spread of the virus, it would

require each employee's full and continuous compliance, something that the DAO could neither

monitor nor ensure:

> It's really easy to say you are going to wear a mask and then not do it.  Masking can
> be unpleasant.  So, particularly for people who do not feel that they are in medical
> danger, the likelihood of their complying is lower than for someone who does on a
> minute-by-minute basis feel like they may be injuring themselves by lowering their
> mask. I remember that being part of our discussion.

(Id. at 249: 4-13.)

Finally, remote work was not possible for many employees, whose physical presence was

required in the office or in court.  (See Krasner Dep. 170:3-5 ("[Krasner] A: Is there any way to

safely accommodate a trial attorney with respect to the Covid-19 vaccine policy?").)  Once again,

remote work was not viable for Spivack, whose position required her physical presence at the

office and in courtrooms.  Although she never requested an accommodation, when she was offered

one—reassignment to the Law Division, allowing her to do appellate work remotely—she refused

"because she wants to do trial work."  (Id. at 151:14.)

The DAO thus "seriously considered substantially less restrictive alternatives" in the hope

that they could achieve the Office's compelling interest—trying "to keep people as safe as we

can." (Id. at 77:7); see Bruni, 824 F.3d at 357.  Concluding that these alternatives were inadequate,

the Office required vaccinations for all non-union employees save one.

In these circumstances, the DAO Vaccine Policy survives strict scrutiny review.

Because the Policy thus passes constitutional muster as a matter of law, I will grant

Krasner's Motion for Summary Judgment on Spivack's First Amendment claim, and I will deny Spivack's cross motion against Krasner as to that claim.

**B. State Law Claim**

Spivack asks me to exercise jurisdiction over her supplemental state law claim under the Pennsylvania Religious Protection Freedom Act.  71 Pa. Stat. Ann. §§ 2401-07.  As she has failed to comply with the statute's notice requirement, however, I cannot.  See Webb v. City of Phila., No. 05-cv-5238, 2007 WL 576313 at *3 (E.D. Pa. Feb. 20, 2007) ("Because compliance with a statutory notice provision is a prerequisite to jurisdiction, the failure to comply with such a provision renders the court unable to hear the claim.").

The PRFPA was "enacted in order to provide more protection to the exercise of religious beliefs than that currently afforded by the Free Exercise Clause of the First Amendment to the Federal Constitution."  Brown v. City of Pittsburgh, 586 F.3d 263, 285 (3d Cir. 2009).  It thus provides that a local government agency may not substantially burden a person's free exercise of religion, including any burden that results from a rule of general applicability, unless the burden is both in furtherance of the agency's compelling interest and the least restrictive means of furthering that interest.  71 Pa. Stat. Ann § 2404(a) and (b).  Yet, "a person may not bring an action in court to assert a claim under this act unless, at least 30 days prior to bringing the action, the person gives written notice to the agency by certified mail."  Id. § 2405(b).  The Act provides four exceptions to this notice requirement:

> **(c) Exception.** A person may bring an action in court without providing the notice required by subsection (b) if any of the following occur:
> > (1) The exercise of governmental authority which threatens to substantially burden the person's free exercise of religion is imminent.
> > (2) The person was not informed and did not otherwise have knowledge of the exercise of the governmental authority in time to reasonably provide notice.

> (3) The provision of the notice would delay an action to the extent that the action would be dismissed as untimely.
> (4) The claim or defense is asserted as a counterclaim in a pending proceeding.

Id. § 2405(c).

Spivack concedes that she failed to comply with the PRFPA's notice requirement. She nonetheless contends that the first exception applies: that the threat to her free exercise of religion was "imminent" when she filed her lawsuit. (Doc. No. 36 at 6.) This is simply untrue. By the time Spivack commenced litigation, "the exercise of governmental authority which threaten[ed] to substantially burden [her] free exercise of religion" was not "imminent"—it had already taken place. Spivack was terminated from her position four days *before* she initiated the instant lawsuit. Moreover, Spivack testified that she had consulted with counsel in December 2021 (months *before* her April 2022 firing) because she knew that she might be terminated "over the vaccination issue." (Doc. No. 32-16, Spivack Dep., at 159.) She thus had ample notice and opportunity to comply with the PRFPA notice requirement.

As Spivack has failed to comply with the 30-day notice provision and because no exception applies, this Court lacks jurisdiction to hear her state-law claim. Webb, 2007 WL 576313 at *3. Accordingly, I will grant summary judgment on Spivack's state law claim in favor of Defendants, and I will deny Spivack's cross motion against Krasner on that claim.

### C.  The City's Liability

Because I will grant Krasner's Motion for Summary Judgment, Spivack cannot as a matter of law prevail in her claims against the City, whose Monell liability is predicated on Krasner's liability. C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)). I will thus grant the City's Motion for Summary Judgment.

V.    **CONCLUSION**

As I discussed at the outset, evaluating government actions taken in response to COVID necessarily requires consideration of the concerns and confusion the pandemic triggered. Although these cannot justify unconstitutional action, the context they provide helps explain the reasons for the actions that were taken.  It is apparent that there was no "systemic effort . . . to violate federal and state law."  Mr. Krasner was most concerned about the health and safety of his staff and the public.  Accordingly, he required employee vaccinations.  He limited exemptions to promote that same concern for health and safety, allowing an exemption only when the COVID vaccine could be shown significantly to threaten an employee's health.  There is absolutely nothing in the record suggesting that anti-religious bias figured in his decisions.  To the contrary, Ms. Spivack refused the DAO's offer of an accommodation, which would have allowed her to keep her job and remain unvaccinated (in accordance with her religious beliefs).  In these circumstances, Ms. Spivack's constitutional rights were not violated.

I will thus grant Mr. Krasner's and the City's Motions for Summary Judgment.  I will deny Ms. Spivack's Motion for Summary Judgment against Defendant Krasner.

An appropriate Order follows.

January 4, 2023

Paul S. Diamond, J.